In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00166-CR
______________________________


JOSE JORGE MARTINEZ, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 115th Judicial District Court
Upshur County, Texas
Trial Court No. 12,924


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Â Â After waiving his right to a jury trial and pleading no contest to the charged offense of
aggravated robbery, Jose Jorge Martinez was found guilty and sentenced to twenty years'
confinement in the Texas Department of Criminal Justice, Institutional Division. Martinez now
appeals, contending the trial court erred by overruling his motion to suppress. We affirm.
Standard of Review
Â Â Â Â Â Â Â Â Â Â Â Â Appellate courts review a trial court's ruling on a motion to suppress by employing an abuse
of discretion standard. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). Because "the
trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be
given their testimony . . . the judge may believe or disbelieve all or any part of a witness's testimony,
even if that testimony is not controverted." State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App.
2000) (citations omitted). Therefore, "[w]e give almost total deference to a trial court's rulings on
questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of
credibility and demeanor," Johnson v. State, 68 S.W.3d 644, 652â53 (Tex. Crim. App. 2002), while
viewing the evidence in the light most favorable to the trial court's ruling, State v. Ballard, 987
S.W.2d 889, 891 (Tex. Crim. App. 1999).
Analysis
Â Â Â Â Â Â Â Â Â Â Â Â In his sole point of error, Martinez contends the trial court erred by denying his motion to
suppress because he was arrested without probable cause and without a warrant by an officer
operating outside his jurisdiction. The State concedes Robert Cromley, the officer investigating the
underlying aggravated robbery, did act outside his jurisdiction when he arrested Martinez, but
maintains that it was not error for the trial court to deny Martinez's motion to suppress because his
statement was given before his arrest. The question on appeal, therefore, is whether Martinez was
in custody at the time he gave his statement, admitting his involvement in the crime.
Â Â Â Â Â Â Â Â Â Â Â Â In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court defined
custodial interrogation as "questioning initiated by law enforcement officers after a person has been
taken into custody or otherwise deprived of his freedom of action in any significant way." A person
is only considered to be in custody, however, if a reasonable person would believe, under the
circumstances, that his or her freedom of action was restrained to the degree associated with a formal
arrest. Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing Stansbury v.
California, 511 U.S. 318 (1994)). Providing some guidance in making this determination, the Texas
Court of Criminal Appeals outlined four general situations that may constitute custody:
(1) when the suspect is physically deprived of his freedom of action in any significant
way, Â (2) Â when Â a Â law Â enforcement Â officer Â tells Â the Â suspect Â that Â he Â cannot leave,
(3) when law enforcement officers create a situation that would lead a reasonable
person to believe that his freedom of movement has been significantly restricted, and
(4) when there is probable cause to arrest and law enforcement officers do not tell the
suspect that he is free to leave.

Id. at 255. Ultimately, after considering all of the objective circumstances, custody determinations
must be made on an ad hoc basis. Id. In other words, we must look to the totality of the
circumstances to determine whether Martinez's freedom of action was restrained to such an extent
that a reasonable person would believe he or she was under arrest.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Investigator Cromley was the only witness to testify at the suppression hearing, clearly stating
that Martinez was not under arrest at the time he confessed his involvement in the robbery.


 He
testified, in part, as follows:
Q.Â Â Â Â Â Â Â Â For what purpose was Mr. Martinez at the police department?

A.Â Â Â Â Â Â Â Â I had gone to Mr. Martinez's residence and asked him if he would be willing
to talk to me about this case. He said he would and I said, well, to do that we'll go
down to the police department where we can sit down and take a statement, and he
voluntarily went with me to the police department and we sat down and took the
audio statement.

Q.Â Â Â Â Â Â Â Â So if he had said no, I'm not going, would you have placed him under arrest
at that time?

A.Â Â Â Â Â Â Â Â No, I would not.

Q.Â Â Â Â Â Â Â Â But he did in fact agree to come with you and give a statement?

A.Â Â Â Â Â Â Â Â He did.

Q.Â Â Â Â Â Â Â Â And yet you still read him the Miranda warning on the audiotape statement,
correct?

A.Â Â Â Â Â Â Â Â That's correct.

On cross-examination, Investigator Cromley admitted that, although Martinez was a suspect in the
case, he neither had a warrant for Martinez's arrest nor presented Martinez to a magistrate before
taking his statement. He maintained, however, that his purpose in visiting Martinez's residence was
simply to talk with Martinez and to elicit any information he had about the case. Investigator
Cromley further testified that, when asked, Martinez not only admitted hearing about the case, but
also voluntarily accompanied him to the police station in his car and gave his statement only after
he was advisedâorally and in writingâof his rights under Miranda.


 
Â Â Â Â Â Â Â Â Â Â Â Â Police station questioning, in and of itself, does not constitute custody. Dowthitt, 931 S.W.2d
at 255. The mere fact that an interrogation begins as noncustodial, however, does not prevent
custody from arising at some point later in time. Id. Generally,
when a person voluntarily accompanies law enforcement to a certain location, even
though he knows or should know that law enforcement suspects that he may have
committed or may be implicated in committing a crime, that person is not restrained
or "in custody." More specifically, so long as the circumstances show that he is
acting only upon the invitation, request, or even urging of law enforcement, and there
are no threats, either express or implied, that he will be taken forcibly, the
accompaniment is voluntary, and such person is not in custody.

Phillips v. State, No. 2-02-452-CR, 2004 Tex. App. LEXIS 1929, at *14â15 (Tex. App.âFort Worth
Feb. 26, 2004, no pet. h.) (citations omitted); see Dancy v. State, 728 S.W.2d 772, 778â79 (Tex.
Crim. App. 1987). Even the fact that Investigator Cromley admitted giving Martinez Miranda
warnings does not alter the situation; instead, "this action probably reflects [Investigator Cromley's]
cautiousness rather than [his] intent to arrest or restrain appellant under the objective circumstances
of the interrogation." Rodriguez v. State, 939 S.W.2d 211, 217 (Tex. App.âAustin 1997, no pet.).
Â Â Â Â Â Â Â Â Â Â Â Â Under similar circumstances, the Texas Court of Criminal Appeals noted that an appellant,
although read his of her Miranda warnings, was not treated as one under arrest when he or she
arrived at a police station for questioning. The appellant was not searched, fingerprinted,
handcuffed, photographed, or told he was under arrest, and, before the time he was actually arrested,
neither requested nor attempted to leave. Dancy, 728 S.W.2d at 777. The record in the present case
is likewise devoid of any such indicia of the intent to take Martinez into custody. The "mere
recitation of such warnings is more indicative of proper cautiousness than it is of the officer's intent
to arrest." Id. It is clear that Investigator Cromley suspected Martinez of involvement in the crime,
but did not consider him to be in custody until after Martinez confessed.
Conclusion
Â Â Â Â Â Â Â Â Â Â Â Â Under the circumstances, we are unable to conclude the trial court abused its discretion in
overruling Martinez's motion to suppress. Accordingly, we affirm the judgment of the trial court.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Josh R. Morriss, III
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Date Submitted:Â Â Â Â Â Â Â Â Â Â March 30, 2004
Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â Â May 11, 2004

Do Not Publish



:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-name:"No Spacing\,Quotation";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpFirst, li.MsoNoSpacingCxSpFirst, div.MsoNoSpacingCxSpFirst
 {mso-style-name:"No Spacing\,QuotationCxSpFirst";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpMiddle, li.MsoNoSpacingCxSpMiddle, div.MsoNoSpacingCxSpMiddle
 {mso-style-name:"No Spacing\,QuotationCxSpMiddle";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpLast, li.MsoNoSpacingCxSpLast, div.MsoNoSpacingCxSpLast
 {mso-style-name:"No Spacing\,QuotationCxSpLast";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 line-height:200%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 line-height:200%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 line-height:200%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 line-height:200%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") f1;
 mso-first-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") f2;
 mso-first-header:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-114-CR%20Bays%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
 /* List Definitions */
 @list l0
 {mso-list-id:842011480;
 mso-list-type:hybrid;
 mso-list-template-ids:-282414852 67698689 67698691 67698693 67698689 67698691 67698693 67698689 67698691 67698693;}
@list l0:level1
 {mso-level-number-format:bullet;
 mso-level-text:\F0B7;
 mso-level-tab-stop:none;
 mso-level-number-position:left;
 text-indent:-.25in;
 font-family:Symbol;}
ol
 {margin-bottom:0in;}
ul
 {margin-bottom:0in;}
-->











 
 
 
 
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No. 06-10-00114-CR

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MICHAEL JAY BAYS,
Appellant

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  V.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE STATE OF TEXAS, Appellee

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the 188th
Judicial District Court

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Gregg County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial Court
No. 38,316-A

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Memorandum Opinion by Chief Justice Morriss








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MEMORANDUM OPINION

Â 

Â Â Â Â Â Â Â Â Â Â Â  Michael Jay Bays
appeals his convictions for continuous sexual assault of a child and sexual
assault of a child.Â  His ten points of
error can be grouped as follows:Â 
challenges to the sufficiency of the evidence to support the
convictions; improper admission of hearsay testimony; improper admission of
expert testimony; the constitutionality of the continuous sexual assault
statute; and the cumulative effect of these purported errors.Â  We affirm the trial courtÂs judgment because (1)
sufficient evidence supports the conviction for continuous sexual abuse of a
child, (2)Â sufficient evidence supports the conviction for sexual assault
of a child, (3) ÂoutcryÂ testimony from great-grandmother Jean was admissible
as a prior consistent statement, (4)Â admitting expert testimony from
Kelsey Drennan was within the discretion of the trial court, (5)Â admitting
expert testimony from Bunny Terrell was within the discretion of the trial
court, (6)Â admitting expert testimony from Jamie English was within the
discretion of the trial court, (7)Â it was not error to admit testimony
that two complainantsÂ statements are Âconsistent,Â (8)Â Section 21.02 of
the Texas Penal Code does not apply to a bench trial, and (9) there was no
cumulative error.

(1)Â Â Â Â Â Â Â  Sufficient
Evidence Supports the Conviction for Continuous Sexual Abuse of a Child

Â 

Â Â Â Â Â Â Â Â Â Â Â  Bays was
charged in three indictments, alleging various sexual offenses against three
girls, who we will refer to as Charlotte, Emily, and Anne.[1]Â  In the first indictment, resulting in this
appeal, Bays was charged, in count one, with the offense of continuous sexual
assault of Charlotte; and in count two, with the offense of sexual assault of
Charlotte.[2]Â  After a six-day bench trial, the trial court
found Bays guilty of both counts alleged to have been committed against
Charlotte, and sentenced Bays to twenty-five and ten yearsÂ imprisonment,
respectively.Â  On appeal, Bays challenges
the sufficiency of the evidence to support these two convictions.

Â Â Â Â Â Â Â Â Â Â Â  In
evaluating the legal sufficiency of the charged offense, we review all the
evidence in the light most favorable to the trial courtÂs judgment to determine
whether any rational jury could have found the essential elements of the crime
beyond a reasonable doubt. Â Brooks v. State, 323 S.W.3d 893, 912
(Tex. Crim. App. 2010) (citing Jackson v.
Virginia, 443 U.S. 307, 319 (1979)); Hartsfield
v. State, 305 S.W.3d 859, 863 (Tex. App.ÂTexarkana 2010, pet. refÂd). Â Our rigorous legal sufficiency review focuses
on the quality of the evidence presented. Â Brooks,
323 S.W.3d at 917 (Cochran, J., concurring). Â We examine legal sufficiency under the
direction of the Brooks opinion,
while giving deference to the responsibility of the jury Âto fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.Â Â Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson, 443 U.S. at 318Â19); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007)).

Â Â Â Â Â Â Â Â Â Â Â  Charlotte,
BaysÂ step-granddaughter, testified to the trial court.Â  At the time of her testimony, she was
fourteen years old and in the eighth grade.Â 
She had lived with Bays and his wife, Barbara, before CharlotteÂs fifth-grade
school year, and there was both a pool and hot tub at the house.[3]Â  In the pool or hot tub Bays touched Charlotte
under her bathing suit. Â He touched her Âboobs,Â
and put his fingers in her vagina and moved his fingers.Â  ÂIt happened a few times, maybe three.ÂÂ  On one occasion, in the hot tub, other adults
were by the hot tub when Bays put his fingers in CharlotteÂs vagina, and Charlotte
thought her mother knew it was happening.Â 
Later, when Charlotte told her mother, though, her mother Âflipped out.Â
Â That led Charlotte to conclude that her
mother had not known what was occurring in the hot tub.Â  Charlotte said she told Barbara about the
abuse several times, but was not believed, or that Barbara did nothing about
CharlotteÂs reports.Â  She tried to tell
her great-grandmother Jean; this was when Charlotte was Âa little older thanÂ Emily,
who was ten years old at the time of trial.Â 
But Charlotte admitted she Âprobably made it seem like an accident
because I wasnÂt taking it too seriously, I guess.Â  ItÂs a little hard to remember since it was,
like, five years ago.Â 

Â Â Â Â Â Â Â Â Â Â Â  Charlotte
described other occasions, while she was living in the Bays home, where Bays
would engage in inappropriate touching.Â  Bays
took Charlotte to parades and water parks.Â 
Sometimes Emily and Barbara would attend, and sometimes not.Â  Charlotte explained how sometimes they would
not arrive at the destination:

Either he would stop to mess with me or we
wouldnÂt go or weÂd have to turn back and go.Â 
But, I mean, most of the time weÂd go to the parade, but weÂd end up
stopping for that reason, and then we end up going back - - like going to the
parade.

ÂMessing withÂ meant Â[t]ouching me in
places that I shouldnÂt be touched at . . . My vagina and just everywhere
really.ÂÂ  This touching was done with
BaysÂ fingers.Â  Charlotte said these
events continued over a span of Âprobably five or six years.Â  Ever since I lived there, ever since I
started living there, and ever since I moved.Â 
It happened a few times after I movedÂ .Â .Â . .ÂÂ  Sometimes Bays made Charlotte hold his penis,
with his hand on top of hers to Âsqueeze it [and] move it.ÂÂ  This kind of touching occurred Âfive times at
most.ÂÂ  Bays also Âmade [Charlotte]
pretty much give him oral sex more than one time . . . . Â Well, one time he tried to, but it didnÂt work
out too well, because - - it just didnÂt happen as well as he planned.Â  But the second time that it - - it happened.ÂÂ  No acts of oral sex are alleged in the
indictment.Â  At the time of trial, Charlotte
had recently turned fourteen.Â  When asked
by the State whether Âsome of these things happen[ed] in 2007 and 2008 and
2009?Â and if Âit happen[ed] more than two or three times in those years?Â Charlotte
replied, ÂYesÂ to both questions.Â  Charlotte
also described riding a four-wheeler, with Bays seated behind her; he was
touching her vagina, asking if it felt good, but she did not state whether he
was touching her inside or outside of her clothes.Â  Charlotte was certain of the last time Bays
assaulted herÂher birthday, February 3, 2009.Â 
However, that incident was made the subject of a separate count in the
StateÂs indictment for sexual assault of a child, resulting in a separate
conviction, which we discuss later in this opinion.

Â Â Â Â Â Â Â Â Â Â Â  We
first review the sufficiency of the evidence to prove the continuous sexual
assault allegation.Â  Based on the
indictment and the statute, the State had to prove that, over a span of thirty
or more days, Bays committed two or more acts of sexual abuse against
Charlotte.Â  See Tex. Penal Code Ann.
Â§ 21.02.Â  The indictment alleged those
acts of sexual abuse to be indecency with a child by contact, by touching
CharlotteÂs genitals; indecency with a child by causing Charlotte to touch
BaysÂ genitals;[4] and sexual
assault by penetrating CharlotteÂs sexual organ with BaysÂ finger.[5]Â  The indictment alleged Bays committed these
acts over a period Âfrom on or about January 1st 2008 through January 30th
2009,Â during which period Bays was seventeen years of age or older and
Charlotte was fourteen years old or younger and not BaysÂ spouse.

Â Â Â Â Â Â Â Â Â Â Â  BaysÂ
defense was to challenge CharlotteÂs credibility and the degree of specificity
in her testimony.Â  Through his
cross-examination of StateÂs witnesses and in recalling Charlotte to the stand,
Bays emphasized CharlotteÂs history of drug abuse and hospitalization for
mental issues, which included prescription antidepressants and medication used
to treat bipolar disorder and schizophrenia.Â 
Bays impeached CharlotteÂs testimony by playing for the trial court
limited sections of a forensic interview where Charlotte, about ten months
before trial, made allegations of the sexual abuse to Drennan, an interviewer
for the Longview ChildrenÂs Advocacy Center.[6]Â  Charlotte acknowledged that, in that earlier
statement, she made no allegations of oral sex, or Ârape,Â which she clarified
as meaning penetration of her sexual organ with BaysÂ sexual organ.Â  Also, during her subsequent examination, Bays
questioned Charlotte about an incident she described where she told Drennan
that Charlotte, Emily, and Anne were all sitting on BaysÂ lap in the living
room of BaysÂ house.Â  However, at trial,
Charlotte had said that only Emily and Anne, not Charlotte, were on BaysÂ
lap.Â  Questioned about this
inconsistency, Charlotte said, ÂI must have made that part up because I was not
sitting on his lap.ÂÂ  Bays cites this
testimony as a distilled example of CharlotteÂs untrustworthiness.

Â Â Â Â Â Â Â Â Â Â Â  Bays
also presented several schoolmates of Charlotte, who opined she was not
believable and often told lies.Â  The
State played a video interview Bays gave to police shortly after they began
their investigation.Â  Bays said in the
video he may have accidentally touched the girls while playing.Â  When he testified at trial, Bays said he had
not slept much the night before giving that statement, as he was distraught when
Child Protective Services (CPS) removed his daughter Emily from the home.

Â Â Â Â Â Â Â Â Â Â Â  Part
of BaysÂ argument is that, because Charlotte offered no specific dates for any
of the sexual offenses (except for the incident she said occurred on her
birthday, addressed below), the State failed to prove its allegations.Â  The statute does not require specific
dates.Â  Bays also argues that, because
Charlotte alleges some of the events occurred before January 1, 2008, there is
no way of knowing which, if any, alleged incidents occurred before that
date.Â  There is no indication, and Bays
has presented no authority, that the general rule that the State is not bound
by the specific dates in an indictment does not apply to Section 21.02 of the
Texas Penal Code.Â  See Scoggan v. State, 799
S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990).Â 
As we have stated, though, Charlotte answered affirmatively when asked
if the abusive acts occurred more than twice in a span of time including 2007,
2008, and 2009.Â  A child-victimÂs
testimony is sufficient to support a conviction for sexual assault.Â  Tex.
Code Crim. Proc. Ann. art.
38.07 (West Supp. 2011); Garcia v. State,
563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); Halbrook v. State, 322 S.W.3d 716, 720 (Tex. App.ÂTexarkana 2010,
no pet.).Â  Logically, a childÂs testimony
alone is also sufficient to establish the predicate offenses to prove
continuous sexual assault of a child.Â 
The finder of fact resolves any disputes in testimony.Â  Hooper,
214 S.W.3d at 13 (citing Jackson, 443
U.S. at 318Â19).Â  The fact-finder is the
exclusive judge of each witnessÂ credibility and the weight to be given each
witnessÂ testimony. Â Whitaker v. State, 977 S.W.2d 595, 598 (Tex. Crim. App. 1998).Â  The evidence is legally sufficient to support
the conviction for continuous sexual assault of a child.Â  We overrule that point of error.

(2)Â Â Â Â Â Â Â  Sufficient Evidence Supports the
Conviction for Sexual Assault of a Child

Â 

Â Â Â Â Â Â Â Â Â Â Â  Bays
also contends that the evidence was insufficient to support his conviction for
sexual assault of a child, alleged in count two of the indictment.Â  The StateÂs charge alleged that, on or about
February 4, 2009, Bays caused the penetration of CharlotteÂs sexual organ with
BaysÂ finger. 

Â Â Â Â Â Â Â Â Â Â Â  Charlotte
was fourteen at the time of trial, so she was clearly younger than seventeen at
the time of the alleged offenses.Â  See Tex.
Penal Code Ann. Â§ 22.011.Â  Bays
argues that, because the indictment alleged the offense happened on or about
February 4, 2009, but Charlotte emphatically stated the last time Bays
assaulted her was on her birthday, February 3, 2009, the State failed to prove
its allegation.

Â Â Â Â Â Â Â Â Â Â Â  The
State is not required to allege a specific date in an indictment. Â Sledge
v. State, 953 S.W.2d 253, 255 (Tex. Crim. App. 1997) (citing Mitchell v. State, 330 S.W.2d 459, 462
(Tex. Crim. App. 1959)). Â The Âon or
aboutÂ language is sufficient, so long as the act occurred before the date of
the presentation of the indictment, but within the relevant limitations period.
Â Id.
at 256; Thomas v. State, 753 S.W.2d
688, 693 (Tex. Crim. App. 1988).Â  Bays
argues that, because Charlotte was unequivocal that the last abusive act
perpetrated on her was on her birthday, the day before the indictmentÂs
allegation date, there was no evidence proving the indictmentÂs
allegation.Â  Bays, though, offers no
legal authority why the above clearly established caselaw does not govern the
instant situation.Â  He directs us to a
footnote in Duron v. State, 956
S.W.2d 547, 551 n.3 (Tex. Crim. App. 1997), where the Texas Court of Criminal
Appeals said, ÂOf course, a defendant may complain, for the first time on
appeal, that the specific incident of a statutory offense for which he was
convicted differs from the specific incident (of the same statutory offense)
for which he was indicted.ÂÂ  However, Duron addressed the sufficiency of an
indictment to charge an accused with an offense.Â  The quoted footnote went on to say, Â[an
accused] cannot complain, for the first time on appeal, that the indictment is defective
in that it did not reflect those details (and, thus, did not allow him to know
what specific incident the grand jury passed upon). Pursuant to Art. 1.14(b),
he must make that objection before trial.ÂÂ 
This citation concerned preservation of error and challenges which could
or could not be made to the sufficiency of the charging instrument to provide
the defendant with notice of the charged crime, not as authority that the State
must prove a specific date alleged in the indictment.[7]Â  Bays also directs us to Professors Dix and
Dawson in the second edition of the Texas Practice series, where the authors
express consternation at this particular facet of Texas indictment law.Â  Nonetheless, the Texas Court of Criminal
AppealsÂ ruling in this area is clear.

Â Â Â Â Â Â Â Â Â Â Â  Although
Charlotte said the sexual assault happened February 3, and the indictment
alleged it occurred the next day, under Texas caselaw this is sufficient.Â  As for the substance of the allegation,
Charlotte said Bays ÂrapedÂ her on February 3, 2009.Â  When describing previous abuses she described
Bays putting his finger in her vagina.Â 
Regarding the incident on February 3, Charlotte said, ÂHe had pretty
much just done what he usually did, but he was - - he was drunk, and that doesnÂt
give him any excuse, but he - - he raped me.ÂÂ 
The State asked if Bays penetrated her vagina, and Charlotte said,
ÂYes.ÂÂ  A short time later the prosecutor
asked, ÂYou said on that day he did the same thing that you already testified
that he did to you before, penetrating you, using his hands on you?ÂÂ  ÂYes.ÂÂ 
It is true that, when Bays called Charlotte to testify in the defense
case, she said that this act of penetration involved BaysÂ sexual organ
penetrating her sexual organ, but this does not preclude the earlier testimony
which supports a finding of digital penetration.Â  The evidence is sufficient to support a
finding of guilt beyond a reasonable doubt for the offense of sexual
assault.Â  We overrule this point of
error.

(3)Â Â Â Â Â Â Â  ÂOutcryÂ Testimony from
Great-Grandmother Jean Was Admissible as a Prior Consistent Statement

Â 

Â Â Â Â Â Â Â Â Â Â Â  In
two points of error argued together, Bays complains that CharlotteÂs great-grandmother,
Jean, was allowed to testify to an extraneous offense and that Jean was not a
proper outcry witness.Â  See Tex.
Code Crim. Proc. Ann. art.
38.072 (West Supp. 2011).Â  Bays did not
object on the basis that the evidence was of an extraneous offense, so we
overrule that contention.Â  See Tex.
R. App. P. 33.1.

Â Â Â Â Â Â Â Â Â Â Â  Jean
testified that, when Charlotte was about age seven, she told Jean, ÂMamaw,
[Bays] touched me . . . I donÂt like him.ÂÂ 
Jean said Charlotte ÂdidnÂt tell me anything - - she stopped; she didnÂt
tell me anything else but that she and [Emily] were in the bed with Michael.ÂÂ  Bays complains the StateÂs notice of intent
to produce JeanÂs testimony as outcry evidence was initially designated to be
offered only in the punishment phase.Â  See Tex.
Code Crim. Proc. Ann. art. 38.072, Â§ 2(1)(B).Â  The trial court, though, found that a
subsequent notice letter from the State gave adequate notice that JeanÂs
testimony would be offered at the guilt/innocence phase.Â  We do not find an abuse of discretion in the
trial courtÂs admission of JeanÂs statement, given the trial courtÂs finding of
adequate notice to Bays.Â  See Tear
v. State, 74 S.W.3d 555, 558 (Tex. Crim. App. 2002).

Â Â Â Â Â Â Â Â Â Â Â  Bays
also argues that JeanÂs statement did not qualify as outcry evidence.Â  We agree.Â 
The outcry statement must be one that Âin some discernible manner
describes the alleged offense.Â Garcia v.
State, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). Â It also Âmust be more than words which give a
general allusion that something in the area of child abuse was going on.Â Â Id. Â By adding the outcry exception to the statute,
the Legislature Âwas obviously striking a balance between the general
prohibition against hearsay and the specific societal desire to curb the sexual
abuse of children.Â Â Id. Â Â[T]he societal interest
in curbing child abuse would hardly be served if all that Âfirst personÂ had to
testify to was a general allegation from the child that something in the area
of child abuse was going on at home.Â Â Id.Â 
JeanÂs description of CharlotteÂs statements allegedly describing abuse
by Bays are only general allegations suggesting something in the realm of child
abuse had occurred.Â  The statements did
not qualify under the outcry statute.

Â Â Â Â Â Â Â Â Â Â Â  The
State argues, however, that JeanÂs testimony is admissible as a prior
consistent statement from Charlotte.Â  See Tex.
R. Evid. 801(e)(1)(B).Â  Jean testified on the first day of the
six-day bench trial, but already BaysÂ defensive strategy had been
demonstrated.Â  Bays assailed CharlotteÂs
reliability and suggested that she fabricated her allegations, perhaps because
her mother wanted money from the Bayses; and he claimed that Charlotte was
responsible for coaching the other two girlsÂ allegations, if not having
outright convinced them to fabricate their allegations.Â  A statement is not hearsay, and is therefore
admissible, where the following criteria are present:

(1) the declarant must testify at trial and be subject
to cross-examination;

Â 

(2) there must be an express or implied charge of
recent fabrication or improper influence or motive of the declarantÂs testimony
by the opponent;

Â 

(3) the proponent must offer a prior statement
that is consistent with the declarantÂs challenged in-court testimony; and,

Â 

(4) the prior consistent statement must be made
prior to the time that the supposed motive to falsify arose.

Â 

Hammons
v. State, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007).Â  Here, Charlotte testified at trial, and was
subject to cross-examination.Â  Through
his examination of the StateÂs witnesses and his case-in-chief, Bays asserted
that Charlotte was untruthful and had fabricated her allegations.Â  The statement offered by Jean was consistent
with CharlotteÂs trial testimony.Â 
According to Jean, the prior statement by Charlotte was made when
Charlotte was seven years old, about seven years before trial.Â  This appears to be well before the supposed
motive to fabricate that Bays suggested at trial; it was certainly before
CharlotteÂs mother was refused a loan by Bays and his wife (CharlotteÂs
maternal grandmother, Barbara Bays), an event that occurred in May 2009.Â  A trial courtÂs ruling on a prior consistent
statement is reviewed for an abuse of discretion.Â  Lawton
v. State, 913 S.W.2d 542, 561 (Tex. Crim. App. 1995).Â  The trial court was within its discretion to
admit JeanÂs recitation of CharlotteÂs statements.[8]Â  Where a trial courtÂs decision to admit
evidence was within the zone of reasonable disagreement and was correct under
any theory of law applicable to the case, the admission will be upheld. Â Walters
v. State, 247 S.W.3d 204, 217 (Tex. Crim App. 2007).Â  We overrule this contention of error.[9]

(4)Â Â Â Â Â Â Â  Admitting Expert Testimony from Kelsey
Drennan Was Within the Discretion of the Trial Court

Â 

Â Â Â Â Â Â Â Â Â Â Â  Bays
complains, in three points of error, that the trial court erred in admitting
testimony from three StateÂs witnesses who the State presented as experts in
the field of child sexual abuse.Â  This
field of study is classified as a Âsoft science,Â akin to psychology.[10]Â  The reliability of ÂsoftÂ scientific evidence
may be established by showing that (1) the field of expertise is a legitimate
one, (2) the subject matter of the expertÂs testimony is within the scope of
that field, and (3) the expertÂs testimony properly relies on and/or uses the
principles involved in the field. Â Weatherred v. State, 15 S.W.3d 540, 542
(Tex. Crim. App. 2000); Nenno v. State,
970 S.W.2d 549, 561 (Tex. Crim. App. 1998), overruled
on other grounds by State v. Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App.
1999).Â  We review a trial courtÂs ruling
on the admissibility of scientific expert testimony for an abuse of discretion.
Â Weatherred,
15 S.W.3d at 542.

Â Â Â Â Â Â Â Â Â Â Â  One
challenged expert witness was Drennan, who conducted forensic interviews of
Charlotte and two other alleged victims of Bays.Â  The trial court overruled BaysÂ objection and
accepted Drennan, who conducted video-recorded forensic interviews of the three
girls, as an expert in the field of forensic interviewing and child sexual
abuse.Â  Drennan summarized her education,
training, and qualifications as:Â  she had
been an investigator with CPS for three-and-a-half years; had a bachelorÂs
degree in psychology; had training in forensic interviewing and had conducted more
than 500 interviews, which were subject to peer review.Â  Though she had not been subject to peer
review since leaving the child advocacy centers for whom she conducted the
interviews, the methods she used were generally accepted in the scientific
community.Â  When asked about the training
she had had to qualify her in the field of child sexual assault, Drennan said
generally that she had received training on physical and sexual abuse, family
dynamics, and drug use, but gave no specifics.Â 
She had investigated ÂmanyÂ allegations of child sexual abuse, testified
ÂmanyÂ times in civil and family courts, and qualified on at least one occasion
as an expert by a trial court, though no specific field was specified.Â  

Â Â Â Â Â Â Â Â Â Â Â  When
Bays voir dired Drennan on her qualifications, she could not remember where she
took her certification class for forensic training, just that it was in Houston
and was put on by the ChildrenÂs Advocacy Centers of Texas.Â  Although she was familiar with an
organization called the National ChildrenÂs Alliance, she was not familiar with
that organizationÂs guidelines.Â  She did
not have a Âwritten protocolÂ for conducting interviews, though, according to BaysÂ
counselÂs question, the organization Âsuggests that anyone certified to do
these [interviews] have written protocols.ÂÂ 
BaysÂ voir dire questions to Drennan all concerned her training and
expertise in forensic interviewing and did not delve into her training for her
expertise on child sexual assault.

Â Â Â Â Â Â Â Â Â Â Â  DrennanÂs
statements were within the scope of her experience dealing with sexually abused
children; in addition to her experience as a forensic interviewer of children,
she had more than three years of experience as an investigator for CPS.Â  The evidence that Drennan was properly using
or relying upon the principles of that field of study was not as apparent.Â  Drennan was vague regarding her specific
training in the field of child sexual assault and did not refer to any publications
of studies which informed her opinions.

Â Â Â Â Â Â Â Â Â Â Â  On
balance, based on DrennanÂs testimony about her experience investigating child
abuse and the methods she used to conduct interviews of children, the trial
court could have inferred that Drennan properly applied the principles used in
the field of study.[11]Â  The trial court was within its discretion in
admitting DrennanÂs testimony as an expert in the field of child sexual
assault.

(5)Â Â Â Â Â Â Â  Admitting Expert
Testimony from Bunny Terrell Was Within the Discretion of the Trial Court

Â 

Â Â Â Â Â Â Â Â Â Â Â  Although
Bunny Terrell never counseled or interviewed any of the three complainants, the
State presented her as an expert on child sexual abuse to testify about
behaviors exhibited by child victims of sexual assault.Â  Bays complains that Terrell was not qualified
as an expert in this field.

Â Â Â Â Â Â Â Â Â Â Â  Although
TerrellÂs bachelorÂs degree was in business management, her masterÂs degree was
in social work.Â  She acknowledged little
to none of her college classes concerned child abuse, but she had been taking
continuing education classes for about fourteen years and had interviewed
thousands of personsÂvictims and alleged perpetratorsÂin her years as a CPS
investigator.Â  With CPS, she was
designated ÂWorker 5Â level, which meant she investigated sensitive or
difficult cases, including those involving death of a child or serious physical
or sexual abuse.Â  She also worked five
years as a forensic interviewer of children and taught child abuse
investigation to law enforcement personnel.Â 
Terrell counseled child physical and sexual assault victims, was a
licensed master social worker, and had accumulated approximately half of the
necessary clinical hours to be certified as a licensed clinical social
worker.Â  

Â Â Â Â Â Â Â Â Â Â Â  Based
on TerrellÂs training and experience, her testimony on traits and behaviors
exhibited by child sexual assault victims was within her field of
knowledge.Â  Like Drennan, Terrell said
the techniques she used in forensic interviewing were generally accepted by the
scientific community.Â  Experience and use
of accepted procedures could conceivably be relevant to the field of child
sexual abuse.Â  Unlike Drennan, Terrell
was able to reference some specific publications she had studied in the field.Â  Based on TerrellÂs claimed experience and
training, the trial court could have found Terrell had properly applied the
principles of the field of study to reach her opinions.Â  See
Jordan, 928 S.W.2d at 555Â56.Â  We overrule this contention of error.

(6)Â Â Â Â Â Â Â  Admitting Expert Testimony from Jamie English Was Within the
Discretion of the Trial Court

Â 

Â Â Â Â Â Â Â Â Â Â Â  Following
BaysÂ case-in-chief, the State offered English in rebuttal, as an expert in the
field of child sexual abuse.[12]Â  English had counseled Charlotte following
that girlÂs allegations against Bays.Â 
EnglishÂs bachelorÂs and masterÂs degrees were in social work; she had
more than 3,000 hours of clinical experience in counseling and was an adjunct
professor of social work at Stephen F. Austin University.Â  She also had experience as an investigator
with CPS and as a forensic interviewer of abused children.Â  English had counseled several dozen children
suspected of being sexually or physically abused.Â  She was working toward obtaining clinical
licensing, which required her to work with a supervisor who conducted peer
review of her counseling.Â  She took
continuing education classes in the fields of child abuse, poverty, mental
health and spirituality, and ethics, but did not specify how many hours or how
recently she had had those classes.Â  She
had testified as an expert in forensic interviewing and child abuse in ten or twelve
district courts. 

Â Â Â Â Â Â Â Â Â Â Â  Based
on EnglishÂs counseling sessions with Charlotte, English concluded that
Charlotte had been consistent in her statements that Bays sexually abused
her.Â  English also said CharlotteÂs
history of cutting herself was consistent with a sexual abuse victim; as is her
having difficulty talking about the abuse, such as oral sex.Â  According to English, it may be years before
some abuse is disclosed.Â  This testimony
was relevant as rebuttal or to explain why Charlotte did not allege oral sex or
ÂrapeÂ until she testified at trial.Â 
Likewise, EnglishÂs testimony about the importance of a child relating
sensory details was relevantÂEnglish said if a child is making things up they
tend to leave out details.

Â Â Â Â Â Â Â Â Â Â Â  Given
the authorities cited above, we also find that English was qualified to offer
her opinion as an expert on the topic of child sexual abuse.Â  Her testimony was within the field, and she
applied the principles of the field to questions about the instant case.Â  In the words of the Jordan court, there was a ÂfitÂ between EnglishÂs opinion testimony
and the facts of the instant case.Â  See id.,
928 S.W.2d at 556.Â  The trial court did
not abuse its discretion in admitting EnglishÂs testimony.Â  We overrule this contention of error.

(7)Â Â Â Â Â Â Â  It
Was Not Error to Admit Testimony that Two ComplainantsÂ Statements Are
ÂConsistentÂ

Â 

Â Â Â Â Â Â Â Â Â Â Â  Bays
complains that hearsay was admitted when Drennan was permitted to testify that
statements made by Anne (the complainant in cause number 06-10-00115-CR) were
consistent with the allegations made by Charlotte.Â  Without objection, Drennan made the same
statement with regard to all three girlsÂ statements later in her testimony.Â  Bays thus failed to preserve any error for
appellate review.

Kelsey Drennan was asked, and answered, as
follows:

Â 

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Q.
Â Â Â Â Â Â  [Are Charlotte and Anne] consistent
with each other?

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â Â Â  And again I want to - - 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  [Defense counsel]:Â 
IÂm sorry, I didnÂt understand the question or the answer in that last
one.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  Restate
your question, please.

Â Â Â Â Â Â Â Â Â Â Â  Â 
Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â Â Â  [Prosecutor]Â  Was [Charlotte]Âs
outcry through the statements that she made to you consistent with [Anne]Âs
statements to you?

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  Yes.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  [Defense counsel]:Â 
Objection, hearsay.Â  

Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE
COURT:Â  Overruled.Â  

Bays claims this is a Âback-handed way to
get before the trier of fact inadmissible hearsay.ÂÂ  He also claims this testimony from Drennan
bolstered CharlotteÂs testimony.

Â Â Â Â Â Â Â Â Â Â Â  A
short time later, Drennan was asked, ÂWhen speaking with [Emily], did you find
what she had to say consistent with [Anne] and [Charlotte]?ÂÂ  Drennan said, ÂYes.ÂÂ  Bays lodged no objection to this
testimony.Â  Any error in the admission of
evidence is cured when the same evidence comes in elsewhere without objection. Â Ethington
v. State, 819 S.W.2d 854, 858Â59 (Tex. Crim. App. 1991); Massey, 933 S.W.2d at 149.Â  DrennanÂs testimony that the three girlsÂ
statements were consistent with each other necessarily means statements of the
first two girls were consistent with each other.Â  By failing to object to the second question
regarding consistency among the three girlsÂ statements, Bays waived any
complaint as to the consistency between just Anne and Charlotte.[13]

We overrule this contention of error.

Â 

(8)Â Â Â Â Â Â Â  Section 21.02 of the Texas Penal Code
Does Not Apply to a Bench Trial

Â 

Â Â Â Â Â Â Â Â Â Â Â  Bays complains that Section 21.02 of
the Texas Penal Code, under which he was charged with continuous sexual assault
of a child, is facially unconstitutional.Â 
BaysÂ argument assails the statuteÂs provision that, where a jury is the
trier of fact, members of the jury are not required to agree unanimously on
which specific acts of sexual abuse were committed by the defendant or the
exact date when those acts were committed.Â 
The jury must agree unanimously that the defendant, during a period that
is thirty or more days in duration, committed two or more acts of sexual
abuse.Â  Tex.
Penal Code Ann. Â§
21.02.Â  A party seeking to invalidate a
statute Âon its faceÂ bears a heavy burden of showing that the statute is
unconstitutional in all of its applications. Â United
States v. Salerno, 481 U.S. 739, 745 (1987); Santikos v. State, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992) (challenger
must establish that no set of circumstances exists under which statute is
valid).

Â Â Â Â Â Â Â Â Â Â Â  Bays
waived a trial by jury; the trial court was the finder of fact in this case. Â Thus, the provision in Section 21.02 does not
apply here.Â  The subsection states:

If a jury is the trier of fact, members of the
jury are not required to agree unanimously on which specific acts of sexual
abuse were committed by the defendant or the exact date when those acts were
committed. The jury must agree unanimously that the defendant, during a period
that is 30 or more days in duration, committed two or more acts of sexual
abuse.

Â 

Tex.
Penal Code Ann. Â§
21.02(d).Â  Here, because the jury was not
the finder of fact, the statute about which Bays complains had no effect on, or
applicability to, him.Â  Where the finder
of fact is one person, the trial court, there can be no question of unanimity.Â  See
Phillips v. State, 193 S.W.3d 904,
915 (Tex. Crim. App. 2006) (Keller, J., concurring) (jury unanimity of concern only
in jury trials, i.e., not an issue in bench trials).Â  Because the subsection about which Bays
complains was not germane to his conviction, we decline to address this
issue.Â  We are prohibited from issuing an
advisory opinion, the distinctive feature of which is that it decides an
abstract question of law without binding the parties. Â See Tex. Const. art. II, Â§ 1; Valley Baptist Med. Ctr. v. Gonzalez, 33
S.W.3d 821, 822 (Tex. 2000).[14]

Â Â Â Â Â Â Â Â Â Â Â  We
overrule this contention of error.

(9)Â Â Â Â Â Â Â  There Was No Cumulative Error

Â 

Â Â Â Â Â Â Â Â Â Â Â  In
his final point, Bays claims the aggregate effect of the errors he has alleged
adversely affected his substantial rights.Â 
See Tex. R. App. P. 44.2(b).Â  Errors may be found harmful in their
cumulative effect. Â See Feldman v. State, 71
S.W.3d 738, 757 (Tex. Crim. App. 2002).Â 
The only error we have found in this appeal was the admission of
great-grandmother JeanÂs testimony as an outcry witness; but we found that
error obviated by other evidentiary rules.Â 
Accordingly, we overrule this point of error.

Â Â Â Â Â Â Â Â Â Â Â  We
affirm the trial courtÂs judgment.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  October
19, 2011

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  December
7, 2011

Â 

Do Not Publish











[1]The
trial court rendered an acquittal for the charges alleging an offense against
Emily.Â  The indictment alleging an
offense committed against Anne is addressed in our opinion in cause number
06-10-00115-CR.

Â 





[2]See Tex.
Penal Code Ann. Â§ 21.02 (West Supp. 2011), Â§ 22.011 (West 2011).

Â 





[3]By
all accounts, Charlotte had not had an easy upbringing.Â  Her mother was only sixteen when she had
CharlotteÂthe product of sexual abuse by a so-called boyfriend of CharlotteÂs
mother.Â  CharlotteÂs mother had
difficulty keeping a job; drug abuse problems; and a series of men in her life
who were not sterling figures in CharlotteÂs childhood.Â  Part of BaysÂ defensive theory stressed a
request by CharlotteÂs mother to borrow money from Bays and his wife,
CharlotteÂs grandmother.Â  Charlotte
acknowledged using illegal drugs and alcohol and cutting and burning herself.





[4]See Tex.
Penal Code Ann. Â§ 21.11(a)(1) (West 2011).

Â 





[5]See Tex.
Penal Code Ann. Â§ 22.011.

Â 





[6]CharlotteÂs
video interview was offered into evidence by Bays for the limited purpose of
impeaching the complainantÂs testimony; by all accounts, it was not viewed in
full by the trial court or considered as substantive evidence of the charged
offenses.Â  We have not considered any
allegations made by Charlotte in the video-recorded interview as substantive
evidence in our review.Â  The video
interviews of the other two girls were admitted as evidence for all purposes.





[7]Bays
does not specifically complain that the State did not elect which conduct on
which it was relying for a conviction, but he does allude to election in his
brief.Â  A point of error should be based
on a single legal theory, lest it risk being overruled as being multifarious.Â Â  See
Tex. R. App. P. 38.1Â Â  Even if we were to treat BaysÂ
allusion to election as properly briefed, we find no place in the record where
Bays asked the trial court to require the State to make an election as to which
conduct on which it was relying as a basis for conviction.Â  See
Scoggan, 799 S.W.2d at 680 n.3 (when
evidence shows two or more acts of intercourse, each of which is an offense for
which defendant may be convicted, and indictment charges only one offense,
State is required to elect the act on which it will rely to secureÂ  conviction, provided accused makes motion for
election); OÂNeal v. State, 746
S.W.2d 769, 771 n.3 (Tex. Crim. App. 1988).





[8]Additionally,
testimonial allusions to Charlotte having made allegations that Bays inappropriately
touched her came in at other occasions in the trial.Â  Charlotte said she tried to tell Jean
something about BaysÂ conduct Âabout four or fiveÂ years before her trial
testimony, when she would have been nine or ten.Â  Charlotte also said the first time Bays
abused her was when she was in first grade, when she was about six or seven.Â  And the video interview of Emily was played
for the trial court; in that interview, Emily said she had seen Bays touch
Charlotte when Charlotte was seven; but Emily would have been three years old
at the time.Â  If a defendant objects to
the admission of evidence, but the same evidence is subsequently introduced
from another source without objection, the defendant waives his or her earlier
objection.Â  Massey v. State, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996).

Â 





[9]The
State also argues that the statements related by Jean were alternatively
admissible under Article 38.37.Â  See Tex.
Code Crim. Proc. Ann. art. 38.37 (West Supp. 2011).Â  We disagree.Â 
Although the statements could qualify as relevant to the previous
relationship between Bays and Charlotte, this would not hurdle the fact that
JeanÂs statements would still be relating hearsay.Â  The statements would not be admissible under Article
38.37 of the Texas Code of Criminal Procedure.

Â 





[10]See Chavarria
v. State, 307 S.W.3d 386, 391Â92 (Tex. App.ÂSan Antonio 2009, no pet.); Dennis v. State, 178 S.W.3d 172, 181Â82
(Tex. App.ÂHouston [1st Dist.] 2005, pet. refÂd); Jensen v. State, 66 S.W.3d 528, 542Â43 (Tex. App.ÂHouston [14th Dist.]
2002, pet. refÂd); Hernandez v. State,
53 S.W.3d 742, 744, 750Â51 (Tex. App.ÂHouston [1st Dist.] 2001, pet. refÂd)
(generally finding child sexual assault or abuse to be legitimate field of
expertise for NennoÂs Âsoft scienceÂ
standard).





[11]Further,
the testimony of Drennan Âwas sufficiently tied to the facts to meet the simple
requirement that it be ÂhelpfulÂ to theÂ finder of fact.Â  Jordan
v. State, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996).





[12]There
is some question whether Bays objected to EnglishÂs qualifications as an expert
in this field, which is the subject of his appellate complaint.Â  At trial, Bays objected to the rebuttal
topics for which the State wanted to present English: Â that Charlotte exhibited behaviors consistent
with a sexually abused child; why a child may be reticent regarding abuse; and
EnglishÂs evaluation of a childÂs level of description.Â  Bays complained these topics were not proper
rebuttal testimony, as they did not address issues or evidence he had brought
up in his defensive case.Â Â  Only after
conducting a voir-dire examination of English did Bays tell the trial court he
Ârenew[ed] [his] objection to her expertise.ÂÂ 
Assuming this was sufficient to preserve his objection, we will address
this point of error.





[13]The
State directs us to Head v. State, 4
S.W.3d 258, 262Â63 (Tex. Crim. App. 1999), where the investigator testified
that he took written statements from the child victim, her mother, and the
childÂs aunt, who was the StateÂs outcry witness.Â  The outcry witness testified first, then the
investigator, Peterson.Â  Peterson was
asked if the statements he received from the child and the outcry witness were
consistent with each other:Â  Peterson
said they were.Â  Id. at 260.Â  Without
explicitly ruling on whether this statement constituted hearsay, the Texas Court
of Criminal Appeals said the analysis should focus on whether the challenged
testimony Âproduces an Âinescapable conclusionÂ that the evidence is being
offered to prove the substance of an out-of-court statement.ÂÂ  Id.
at 262 (quoting Schaffer v. State,
777 S.W.2d 111, 114 (Tex. Crim. App. 1989)).Â 
The Texas Court of Criminal Appeals eventually said the situation was Âa
close caseÂ and Âclearly within the trial courtÂs discretion to conclude that
the testimony did not reveal to the jury the substance of the out-of-court
statements.Â  The disputed testimony
revealed only that the three statements related basically the same facts; it
did not reveal the substance of what those facts were.Â  Neither did any other evidence, at that point
in the trial, indicate the contents of any of the three statements, what facts
the statements had in common, or how any of the facts were consistent.Â  At best, when the trial court ruled on the
admissibility of the testimony, the jury may have been able to deduce what the
child-complainant had told Peterson by referencing what she had told her
aunt.Â  The trial court could have
reasonably determined that this sort of inferential leap did not provide the
requisite degree of certainty Âthat the StateÂs sole intent in pursuing this
line of questioning was to convey to the juryÂ the contents of the out-of-court
statements.Â  Id.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Even
if Bays had preserved this complaint for our review, the trial court was within
its discretion to overrule the hearsay objection.Â  As in Head,
the child victim had not testified at the time the witness said other witnesses
were ÂconsistentÂ with the complainantÂs statement.Â  Drennan, the witness in the instant case, did
not reveal the specific statements or details of the allegations made by
Charlotte or Emily.Â  There was no Âinescapable
conclusionÂ that DrennanÂs testimony was offered to prove statements made
outside the courtroom.Â  See id.
at 261.





[14]At
least three Texas appellate courts have found that Section 21.02 of the Texas
Penal Code is constitutional and that it does not allow for nonunanimous jury
verdicts.Â  See Martin v. State, 335
S.W.3d 867, 873 (Tex. App.ÂAustin 2011, pet. refÂd); Reckart v. State, 323 S.W.3d 588, 601 (Tex. App.ÂCorpus Christi
2010, pet. refÂd); Render v. State,
316 S.W.3d 846, 858 (Tex. App.ÂDallas 2010, pet refÂd).